Chen Kasher
SCHLICHTER BOGARD, LLC
100 South Fourth Street, Suite 1200
St. Louis, MO, 63102
(314) 621-6115
(314) 621-5934 (fax)
ckasher@uselaws.com
*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SHAKIRA WILLIAMS-LINZEY, JENNIFER PATTON, and KATHLEEN MCFARLAND, individually and as representatives of a class of similarly situated individuals, | No. 3:25-cv-14660 (RK) (TJB) |
| *Plaintiffs*, | |
| v. | FIRST AMENDED CLASS ACTION COMPLAINT |
| EMPOWER ADVISORY GROUP, LLC; EMPOWER RETIREMENT, LLC; EMPOWER FINANCIAL SERVICES, INC.; and EMPOWER ANNUITY INSURANCE COMPANY OF AMERICA, | JURY TRIAL DEMANDED |
| *Defendants*. | |

## FIRST AMENDED COMPLAINT

1.      Plaintiff Shakira Williams-Linzey's address is 13 Fordham Road,

Somerset, New Jersey 08873. Plaintiff Jennifer Patton's address is 27530

Lakeview Drive # 285, Helendale, California 92342. Plaintiff Kathleen

McFarland's address is 10110 West Candlewood Drive, Sun City, Arizona 85351. Defendant Empower Advisory Group, LLC's principal place of business is located at 8515 E. Orchard Road, Greenwood Village, Colorado 80111. Defendant Empower Retirement, LLC's principal place of business is located at 8515 E. Orchard Road, Greenwood Village, Colorado 80111. Defendant Empower Financial Services, Inc.'s principal place of business is located at 8515 E. Orchard Road, Greenwood Village, Colorado 80111. Defendant Empower Annuity Insurance Company of America's principal place of business is located at 8515 E. Orchard Road, Greenwood Village, Colorado 80111.

2. This action[1] arises from a scheme to significantly mislead retirement plan participants and greatly enhance corporate profits by Defendant Empower Advisory Group, LLC ("Empower Advisory"), and its affiliates Empower Retirement, LLC ("Empower Retirement"), Empower Financial Services, Inc. ("Empower Financial Services"), and Empower Annuity Insurance Company of America ("Empower Annuity") (collectively, "Defendants" or "Empower").[2]

3. Defendants instituted a corporate policy that strongly encouraged, and

---

[1] Plaintiffs file this First Amended Complaint as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B).

[2] Until August 2022, Empower Advisory Group, LLC was known as Advised Assets Group, LLC, Empower Financial Services, Inc. was known as GWFS Equities, Inc., and Empower Annuity Insurance Company of America was known as Great-West Life & Annuity Insurance Company.

in many instances required, its sales representatives to use highly misleading sales

tactics to induce retirement plan participants to transfer assets from their employer-

sponsored retirement plans and into Defendants' high-fee laden non-plan products

("Empower Non-Plan Products" or "Non-Plan Products"),[3] which include but are

not limited to Empower managed IRA's ("Managed Account") and self-directed

IRA's ("Self-Directed IRA's").[4]

4.    A critical component of this scheme involved Empower Retirement's

egregious and wholly improper abuse of its position as a recordkeeper for

---

[3] Defendants' Managed Account program is also marketed as "Empower Premier IRA" and Defendants' individualized-investment-selection and allocation service is marketed as "My Total Retirement." Fees are charged separately for Defendants' IRA and individual investment services. Empower advisors were instructed by Empower to steer participants toward either an Empower Managed Account or, in the alternative, an Empower Self-Directed IRA. Empower also offered participants in the Self-Directed IRA a "free look" or "free preview," which includes the use of the Managed Account's individualized-asset-allocation and investment-selection services.

[4] In July 2021, the Securities and Exchange Commission ("SEC") and the New York Attorney General imposed a $97 million fine on another registered investment advisor, TIAA-CREF Individual & Institutional Services, LLC ("TIAA Services"), based on similar conduct. *In the Matter of TIAA-CREF Individual & Institutional Services, LLC.*, Release No. 10954 (Jul. 13, 2021), *available at* https://www.sec.gov/files/litigation/admin/2021/33-10954.pdf, *archived at* https://perma.cc/7QWZ-EVM5. The SEC found, among other things, that TIAA Services failed to "adequately disclose conflicts of interest" and disseminated "inaccurate and misleading statements in connection with recommendations that clients invested in Teachers Insurance and Annuity Association of America record-kept employer-sponsored retirement plans roll over retirement assets into a managed account program called 'Portfolio Advisor.'" *Id*. at 2.

employer-sponsored retirement plans. Empower Retirement abused its role as retirement plan recordkeeper as follows: *First*, Empower Retirement improperly and repeatedly leveraged its position as plan recordkeeper to harvest highly confidential, private financial data concerning retirement plan participants for its economic benefit. *Second*, Empower Retirement provided this highly confidential information to Empower Advisory, which used the data to identify and target certain categories of retirement plan participants, including participants with large account balances nearing retirement age. *Third*, Empower Advisory's sales representatives approached these targeted retirement plan participants, and falsely portrayed Defendants' high-cost Non-Plan Products as the superior – and in fact the *only* – recommended investment option, regardless of whether the Non-Plan Product was actually in the best interests of retirement plan participants.

5.       In falsely portraying Defendants' Non-Plan Products as the best (and *only*) investment option for retirement plan participants, Empower Advisory's sales representatives actively concealed from plan participants the *extremely* high costs associated with the Non-Plan Products. Indeed, investors in Defendants' Non-Plan Products pay multiple layers of exorbitant investment fees that are routinely *significantly* higher than the fees retirement plan participants would pay by keeping their assets in their employer-sponsored retirement plans. Additionally, Managed Account investors not only pay a percentage fee, or "expense ratio," on

4

all assets in which they invest, but, on top of that, Empower Advisory charges a *separate*, asset-based investment fee of up to 55 basis points (i.e., 0.55%) – fees on top of fees – from which Defendants benefit at retirement plan participants' expense.

6.      Empower Advisory also repeatedly misleads investors about the nature of its advice. Empower Advisory sales representatives claim that they provide individualized investment advice and options that are customized based on the needs of retirement plan participants. But these claims are false. In fact, Defendants' Managed Account program is *not* customized to the individual needs of investors, but instead has seven preset asset allocations, which are heavily populated with investment funds offered by Empower Financial Services. The upshot: retirement plan participants who are misled by Defendants into moving their retirement assets to Defendants' Managed Account program pay *multiple* sets of fees to Empower Advisory and its affiliates – an "Investment Advisory Fee" to Empower Advisory, and "Fund Fees" to Empower Financial Services.

7.      Making matters worse, Defendants' Managed Account program does not merely involve a one-time investment recommendation, but rather encompasses *ongoing* investment advice, which is delivered on an ongoing and repeated basis. As part of Defendants' scheme, the assets of investors in the Managed Account program are *automatically* invested in a model investment

portfolio created by Defendants that includes investment funds offered by Empower Financial Services. Where investors' asset allocations deviate from the model investment portfolio, funds are reallocated into the model portfolio – with the result that assets are automatically funneled into investments that generate *even more* fees for Defendants.

8. Empower also concealed sales representatives' conflicts of interest, requiring sales representatives to falsely claim that their recommendations were objective and non-commissioned – when in fact Empower's bonus structure created *significant* financial incentives for its sales representatives to recommend Defendants' Non-Plan Products. Empower sales representatives' incentive compensation varied based on the type of product they recommended to plan participants.

9. Unbeknownst to retirement plan participants, and concealed from them, Empower sales representatives received the highest incentive compensation for recommending an Empower Managed Account, and received the next highest incentive compensation based on recommending the Self-Directed IRA option to plan participants. Also concealed from plan participants, Empower set monthly, quarterly, and annual internal asset growth goals, which Empower sales representatives had to meet with respect to Non-Plan Products or they would face disciplinary action, including but not limited to receiving less incentive

compensation and being required to attend regular one-on-one meetings with supervisors.

10. As a result of this misleading scheme, Defendants have reaped massive and unlawful profits at the expense of Plaintiffs, who were charged unreasonably high fees for investments that underperformed those available to Plaintiffs through their employers' tax-favored plans.

11. These practices of Empower in private defined contribution retirement plan were identical to Empower's practices in government retirement plans. On August 29, 2025, the SEC issued a cease-and-desist Order against Empower Advisory and Empower Financial Services for this same behavior in government retirement plans. The Order related to Empower Advisory cross-selling Empower Managed Accounts, which occurred from July 2019 through December 31, 2022, and ordered Empower Advisory and Empower Financial Services to pay penalties of nearly $6 million.[5] The SEC's cease-and-desist Order concerned Empower Advisory and Empower Financial Service's **"inadequate disclosure of conflicts of interest and misleading statements by Respondents in connection with advising participants in Empower Retirement, LLC's . . . Government**

---

[5] *In the Matter of Empower Advisory Group, LLC and Empower Financial Services, Inc.*, Release No. 103809 (Aug. 29, 2025), *available at* https://www.sec.gov/files/litigation/admin/2025/34-103809.pdf, *archived at* https://perma.cc/UBE2-MMUE.

**Markets[6] segment about whether to enroll in Empower Advisory's Managed Account service."[7]**

12.     The SEC found that Empower Advisory did not "adequately disclose the conflicts of interest that the incentive compensation system presented for certain [Empower advisors]."[8] According to the SEC, Empower Advisory advisors made statements that they were "salaried and/or noncommissioned," that they were acting "in a fiduciary capacity," and "that they were acting in the Plan Participant's best interest."[9] The SEC found Empower Advisory did not "establish, maintain, and enforce written policies and procedures reasonably designed to identify and address conflicts of interest in connection with recommendations to enroll in the Managed Account service."[10] Empower Advisory set annual performance goals for Empower advisors, including specific goals for enrolling participants in Empower Managed Accounts, which amounted to "25% to 35% of [Empower advisors'] annual performance goal set."[11] "This compensation structure incentivized

---

[6] "Empower describes its Government Markets segment as providing retirement plan services to individuals employed by a state government or political subdivision, or by agencies or instrumentalities thereof." *Id*. at 4.

[7] *Id*. at 2 (emphasis added).

[8] *Id*.

[9] *Id*. at 6 (emphasis added).

[10] *Id*. at 4.

[11] *Id*.

[Empower advisors] to enroll Plan Participants in the Managed Account service."[12]

13.    Defendants' conduct here violated Defendants' fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") as well as ERISA's prohibited transaction rules – duties which are "the highest known to the law." Pub. L. No. 93-406, 29 U.S.C. § 1001 et seq. (enacted Sept. 2, 1974); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 333 (3d Cir. 2019) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). Even if Defendants were not fiduciaries within the meaning of ERISA – and they were, and are – Defendants are nonetheless subject to liability due to their knowing participation in ERISA violations by the sponsors of the plans in which Plaintiffs and class members participated (the "Plan Sponsors"). Defendants also concealed their breaches of fiduciary duty and prohibited transactions.

14.    To obtain redress for Defendants' misconduct, Plaintiffs bring this action on behalf of a proposed class of similarly situated individuals. Plaintiffs and the class seek an order requiring Defendants to make good all losses sustained by class members and for appropriate equitable relief to disgorge Defendants' ill-gotten profits. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3).

---

[12] *Id*. at 5.

## JURISDICTION AND VENUE

15.    **Subject-matter jurisdiction.** This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law and is brought under 29 U.S.C. § 1132(a)(2) and (3).

16.    **Venue.** This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District where at least one of the alleged breaches or violations took place, and where at least one Defendant resides or may be found.

17.    **Standing.** Plaintiffs and class members sustained damages and financial losses that are fairly traceable to Defendants' breaches of fiduciary duty and other violations of ERISA, and those injuries may be redressed by a judgment of this Court. But for Defendants' misconduct, the assets in Plaintiffs' and class members' retirement plan accounts would have had an opportunity for continued appreciation within their plans and would not have been subject to the excessive and unreasonable fees and inferior investment performance of the Empower Non-Plan Products. But for Defendants' egregious misconduct, Defendants would not have been unjustly enriched through fees and expenses assessed against Plaintiffs' and class members' use of Empower's Non-Plan Products. Plaintiffs and all class members have standing to pursue remedies to prevent Defendants from retaining the benefit of their misconduct, which is one proper measure of injury or damages.

Plaintiffs and all class members also have standing to seek disgorgement of or a constructive trust on Defendants' ill-gotten profits realized as a result of their significant breaches of the duty of loyalty and prohibited transactions. *See Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 299 (3d Cir. 2007) ("ERISA allows a district court to order disgorging . . . [ill-gotten] profits and placing a constructive trust on them for the ultimate benefit of the plan participants."); *see also Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1409–19 (9th Cir. 1988).

## PARTIES

### I.    Plaintiffs

18.    Plaintiff Shakira Williams-Linzey was a Director of Reproductive Health & Childhood Initiatives and a participant in the ERISA-governed Central Jersey Family Health Consortium 403(b) Pension Plan. Ms. Williams-Linzey currently resides in Somerset, New Jersey. Ms. Williams-Linzey opened a Self-Directed IRA in 2022 as a result of Defendants' breaches of fiduciary duty described below.

19.    Plaintiff Jennifer Patton was a Senior Site Manager and a participant in the ERISA-governed Heliogen, Inc. 401(k) Plan and the Freudenberg

11

Companies 401(k) Savings Plan.[13] Ms. Patton currently resides in Helendale, California. Ms. Patton opened a Managed Account in 2021 and 2024 as a result of Defendants' breaches of fiduciary duty described below.

20.    Plaintiff Kathleen McFarland was a Senior Administrator and a participant in the ERISA-governed Global Medical Response, Inc. 401(k) Plan. Ms. McFarland currently resides in Sun City, Arizona. Ms. McFarland opened a Managed Account in 2022 as a result of Defendants' breaches of fiduciary duty described below.

## II.    Defendants

21.    Defendant Empower Advisory is a limited liability company with its headquarters and principal place of business in Greenwood Village, Colorado. Empower Advisory is a wholly owned subsidiary of Empower Annuity. Empower Advisory is a registered broker-dealer under the Securities Exchange Act of 1934 and an investment advisor under the Investment Advisers Act of 1940 and provides investment advisory services to individuals.

22.    Defendant Empower Retirement is a Colorado limited liability company whose sole member/owner is Empower Annuity, a corporation

---

[13] ERISA defines "participant" as "any employee or former employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan . . . or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7).

12

incorporated in Colorado with a principal place of business located in Greenwood Village, Colorado. Empower Retirement also has a corporate office in Somerset, New Jersey. Empower Retirement's clients include thousands of defined contribution retirement plans, which utilize Empower Retirement's investment options and administrative services (such as recordkeeping of participants' accounts).

23. Defendant Empower Financial Services, formerly GWFS Equities, Inc., is a corporation incorporated in Delaware with a principal place of business in Colorado.

24. Defendant Empower Annuity, formally known as Great-West Life & Annuity Insurance Company, is a corporation incorporated in Colorado with a principal place of business in Greenwood Village, Colorado.

25. As explained below, by making rollover recommendations that benefited Defendants at Plaintiffs' and class members' expense, Defendants acted as fiduciaries as defined by ERISA, breached their fiduciary duty of loyalty, and engaged in transactions categorically prohibited by ERISA. To the extent they were not ERISA fiduciaries, Defendants nevertheless knowingly participated in the Plan Sponsors' ERISA violations.

13

**FACTS APPLICABLE TO ALL COUNTS**

I.      **Defined contribution retirement plans are institutional investors with the ability to obtain low fees compared to the retail market.**

26.      An employer-sponsored retirement plan may be classified as a defined benefit plan or a defined contribution plan. A defined benefit plan is a traditional pension; the employee is guaranteed a specified monthly payment, and the risk of loss falls on the employer who is responsible for ensuring that the plan has sufficient assets to meet its obligations for benefit payments. In contrast, a defined contribution plan shifts the risk of loss to the employees. "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Plaintiffs and the class members are participants in defined contribution retirement plans.

27.      In a defined contribution retirement plan, participants contribute pre-tax earnings (often matched by the employer up to a certain percentage) into an individual account and direct the contributions into one or more options from the plan's investment menu, which is assembled by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

14

28.    "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.* The United States Department of Labor has illustrated that a 1% difference in fees reduces the average worker's account balance by 28% after 35 years.[14] In dollar terms, this fee differential adds up to nearly $500,000 after 40 years.[15]



---

[14] U.S. Dept. of Labor, *A Look at 401(k) Plan Fees*, at 2 (Sept. 2019), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf, *archived at* https://perma.cc/YS2V-4PVS.

[15] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR (May 15, 2020), *available at* https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/, *archived at* https://perma.cc/8LFX-Z4FA.

15

29.     Defined contribution retirement plans are institutional investors. In contrast to an individual seeking to make a small investment in the retail market at retail prices, a defined contribution retirement plan pools the purchasing power of the combined assets of all of the plan's participants – often thousands of individuals. Thus, employer-sponsored defined contribution retirement plans have the leverage to obtain much lower fees than an individual would be able to obtain in the retail market. As illustrated above, those lower fees produce enhanced retirement savings compared to what an individual could achieve investing outside of a retirement plan. Excessive fees in defined contribution retirement plans deprive employees and retirees of funds that would be invested and grow in their plans.

## II.     Empower adopted a company-wide policy of providing deceptive and misleading investment advice for the purpose of enhancing Defendants' revenues and profits at the expense of retirement plan participants.

30.     Empower was created in 2014 through a three-part merger of Great-West Financial, Putnam Investments, and J.P. Morgan Retirement Plan Services. In 2020, Empower acquired Personal Capital, which at the time had over $13 billion in assets, and announced the acquisition of MassMutual's retirement services arm, which was completed in 2021. Through that transaction, Empower inherited MassMutual's approximately $167 billion in assets and 2.5 million retirement plan participants. This transaction increased Empower's participant base to over 12.2

16

million people and its recordkeeping assets to approximately $834 billion, covering approximately 67,000 retirement plans. In 2022, Empower then acquired Prudential's retirement business (headquartered in Newark, New Jersey) in a $3.5 billion transaction, which was inclusive of Prudential's defined contribution business. In August 2022, Empower changed the names of its U.S. companies with legacy "Great-West" names to Empower branded names.[16] This included investment products offered by Empower, including mutual funds previously marketed under the Great-West name.

31.     Empower Annuity is the parent company of Empower Advisory, Empower Financial Services, and Empower Retirement.

32.     Today, Empower Retirement is the second-largest recordkeeper of defined contribution retirement plans in the United States, with approximately 17.4 million participants in Empower recordkept plans, over $1.4 trillion in assets under administration, and approximately 71,000 plan clients. Defendants sell billions of dollars annually of Empower's Non-Plan Product services to retirement plan

---

[16] *Empower bolsters its brand with legacy name alignment*, EMPOWER PRESS CENTER (Aug. 2, 2022), *available at* https://www.empower.com/press-center/name-change, *archived at* https://perma.cc/NH96-L7R9. As noted above, Advised Assets Group, LLC became Empower Advisory Group, LLC (Empower Advisory); Great-West Life & Annuity Insurance Company became Empower Annuity Insurance Company of America, LLC; GFWS Equities, Inc. became Empower Financial Services, Inc.; and Great-West Funds, Inc. became Empower Funds, Inc.

participants throughout the United States.

33.    Empower Retirement provides deferred compensation plans to private institutions and state, federal, and local governments or agencies around the country, and offers individual retirement accounts, commonly known as IRAs, to people who are saving money for retirement.

34.    Because of the services it provides, Empower Retirement has direct access to the most *highly* confidential information, including Social Security numbers, investment choices for investing retirement assets, years until retirement, amounts of assets owned, and personal information concerning an enormous population of individuals with retirement savings available to invest. This information is obtained by Empower Retirement only because it must have it to carry out its recordkeeping role and for no other purpose.

35.    Defendants capitalized on Empower Retirement's access to this highly confidential information by using this knowledge to develop a scheme to profit from use of this highly confidential personal financial information to drive participants out of low-fee investments and retirement plans to high-fee Non-Plan Products, which contain individual funds owned by Empower's affiliates, including Empower Financial Services.

36.    Defendants have used the detailed knowledge and highly confidential information that Empower Retirement has about investors on its recordkeeping

platforms to develop target lists for Empower's sales representatives. These target lists consist of retirement plan participants nearing retirement age or who have recently retired, retirement plan participants with large account balances, and retirement plan participants with investment histories that suggest a lack of high-level sophistication concerning investments.

37.    Armed with this highly sensitive information, Empower advisors were required to meet weekly and meet monthly goals related to the sale of Non-Plan Products, and to target individual retirement plan participants and institutions with the largest account balances to solicit them to use their retirement assets to purchase Defendants' Non-Plan Products. If they did not meet these goals, the Empower advisors faced disciplinary actions and were placed on improvement plans in order to ensure they increased the sale of Non-Plan Products.

38.    Under the guise of offering objective, fiduciary advice from a "Registered Investment Advisor," Empower's sales representatives have used manipulative sales tactics and falsehoods to push retirement plan participants into the Non-Plan Products, without regard to whether doing so is in participants' best interests.

39.    Among other deceptive tactics, Empower and its sales representatives have:

19

a. misrepresented that Empower advisors are or were objective and disinterested fiduciaries providing recommendations in the best interest of participants;

b. misrepresented the fact that Empower advisors are or were salaried, non-commissioned, and financially disinterested in whether a participant purchases Empower's Non-Plan Product investment-advisory services;

c. deliberately concealed the fact that Empower's bonus and compensation structures have created significant financial incentives for advisors to persuade participants to purchase Empower Non-Plan Products;

d. deliberately concealed the fact that Empower's Non-Plan Products charge higher fees and generate greater revenue for Empower and its affiliates than other lower-cost and readily available alternatives;

e. deliberately concealed the fact that Empower's "proprietary software" only recommends that participants purchase the Non-Plan Products; and

f. deliberately concealed the fact that Empower's Non-Plan Products and the funds included in the Non-Plan Products are operated by closely related, affiliated entities.

20

40.     As a result of this scheme, Defendants have reaped and continue to reap very substantial, unlawful profits at the expense of retirement plan participants, who Empower Advisory charges "Investment Advisory Fees" for illusory services, in addition to "Fund Fees" paid to Empower affiliates.

41.     Empower Advisory's actions breached the fiduciary duties that Empower Advisory owed to Plaintiffs and members of the class.

42.     Empower Retirement, Empower Financial Services, and Empower Annuity facilitated, aided, assisted, and were unjustly enriched by Empower Advisory's breaches of fiduciary duties, including by improperly harvesting, and then providing to Empower Advisory, highly confidential information about Plaintiffs and class members, who were targeted by Empower Advisory's deceptive tactics.

**A.     Empower induced Plaintiffs to purchase Non-Plan Product services based on falsities, omissions, and misrepresentations.**

43.     Since at least 2015, Defendants have utilized the scheme described herein to deceive retirement investors into purchasing investment advisory services by purchasing Non-Plan Products based on false representations.

44.     Empower Retirement, under direction from Empower Annuity, has identified certain of its retirement plan participants as potential targets for its Non-Plan Products program based on the participants' age, employment status, and

21

other personal information. Empower Retirement, under direction from Empower Annuity, then provides this personal information, along with participant contact information, to Empower Advisory, which supplies lists of potential targets to its sales representatives.

45.    Empower advisors then contact targeted participants under the false guise of providing advice to help maximize the value of participants' retirement savings.

46.    What occurs during communications between Empower advisors and retirement plan participants is uniform nationwide and is done in each retirement plan that Empower Retirement services.

47.    In most instances, Empower Advisory refers to these communications as "Retirement Readiness Reviews" ("RRRs").[17] In RRRs, Empower Advisory requires its advisors to emphasize that they are Registered Investment Advisors, which means the advisors are providing independent, objective advice in the retirement plan participant's best interest. This also means that they are fiduciaries to the plan participants to whom they are offering advice.

---

[17] Although not all communications during which Empower and its advisors make the misrepresentations described in this complaint are formally called RRRs by Empower or its advisors, Plaintiffs use the term RRR in this complaint to describe communications during which Empower and its advisors make the misrepresentations described herein.

48.     The script Empower Advisory required its advisors to follow in RRRs required them to inform participants that they "may . . . act in the capacity of an Investment Advisor Representative of [Empower Advisory], which is a Registered Investment Adviser firm."

49.     Empower Advisory also encouraged its advisors to emphasize (falsely) during RRRs that they had no financial incentive to recommend Empower's Non-Plan Products program by indicating that they were salaried or non-commissioned – even though that was untrue. [18]

50.     Empower Advisory made similar representations to the public. For example, Empower Advisory's Government Markets segment[19] has indicated in marketing brochures provided to Empower Retirement deferred-compensation plan participants and others that its advisors are salaried, non-commissioned, and

---

[18] According to the SEC, Empower Advisors "did not disclose that they had a financial incentive to enroll the Plan Participant in the Managed Account service." *In the Matter of Empower Advisory Group, LLC and Empower Financial Services, Inc.*, Release No. 103809, at 6 (Aug. 29, 2025), *available at* https://www.sec.gov/files/litigation/admin/2025/34-103809.pdf, *archived at* https://perma.cc/UBE2-MMUE. Empower Advisors told plan participants "they were salaried or noncommissioned, acting in a fiduciary capacity, and that they were acting in the Plan Participant's best interest." *Id.* "In more egregious cases, [Empower Advisors] even told Plan participants that their enrollment in the Managed Account service would not affect the [Empower Advisor's] compensation and that no conflict of interest existed." *Id.*

[19] Advisors in Empower's Government Markets segment sell Managed Account services to employees of state, federal, and local governments or agencies enrolled in Empower Retirement's deferred-compensation plans.

objective:

> *Your FBC Advisor is a salaried, noncommissioned professional with one goal: to help you to and through your never-ending summer ... retirement!*

51.     However, this assertion is false. Empower Advisory advisors receive financial incentives, bonuses, commissions, and other compensation based on the value of the assets that they convince participants to convert into Non-Plan Products. The amount of these financial incentives varies based on the Non-Plan Product recommended by an advisor. Empower advisors had substantial asset growth goals directly tied to their compensation. In order to meet these goals, Empower advisors had asset growth goals that required advisors to sell millions of dollars of Non-Plan Products on an annual basis. If Empower advisors were unable to meet their asset growth goals, Empower Advisory placed advisors on performance improvement plans and required advisors to meet with superiors and outline how they would meet the required quotas imposed by Empower Advisory. Approximately half the bonus compensation which Empower advisors received

24

annually was based on the sale of Non-Plan Products to participants.[20] The bonus compensation received by Empower advisors for cross-selling Non-Plan Products represented a significant percentage of their overall compensation.

52.    Empower Advisory has additionally emphasized in writing to its advisors the "critical" importance during RRRs of "set[ting] the expectation at the onset of discussion with the participant" that advisors will be "*giving them fiduciary, best interest advice* tailored to their individual needs and HELPING THEM IMPLEMENT CHANGES that they may need to make" (emphasis added).

53.    During RRRs, Empower advisors ask participants a series of "Probing Questions" designed, according to Empower Advisory, to identify what Empower Advisory refers to as participants' "*pain points*" and "*landmines*" in instructions given to advisors. The questions include:

    a.  What type of investment strategy do you employ?

    b.  Do you know or have the time to rebalance your account quarterly?

    c.  How frequently do you monitor or change your investment allocation?

    d.  How do you feel about investment fluctuations?

---

[20] According to the SEC, enrolling participants in Empower managed accounts alone comprised 25-35% of an advisor's annual performance goal set. *In the Matter of Empower Advisory Group, LLC and Empower Financial Services, Inc.*, Release No. 103809 (Aug. 29, 2025), p. 4, *available at* https://www.sec.gov/files/litigation/admin/2025/34-103809.pdf, *archived at* https://perma.cc/UBE2-MMUE.

e.  Do you enjoy the responsibility of building and maintaining your own portfolio?

f.  Have you thought about lifestyle changes that you would make in retirement?

g.  How comfortable are you at creating your retirement strategy yourself?

54.   Empower advisors represent to retirement plan participants that they are inputting the information gathered from these questions into Empower Advisory's "proprietary software" to generate a personalized, objective recommendation purportedly in the participant's best interest. Empower Advisory tells participants the software was created by third-party Morningstar, a nationally known third-party investment analysis and financial services firm.

55.   However, contrary to Empower Advisory's representation that its software generates personalized, objective recommendations, the software only produces one recommendation: purchasing Empower's Non-Plan Products.

56.   After the software generates the only option it is designed to generate – that the retirement plan participant should purchase Empower's Non-Plan Product services – Empower Advisory requires its advisors to "communicat[e] the advice" that it claims was "generated by Morningstar."

57.   Empower Advisory does not disclose – and in fact actively conceals –

26

that its proprietary software and advisors are only permitted to make a single recommendation: that participants purchase Empower's Non-Plan Products.

58. Furthermore, contrary to Empower Advisory's false and misleading misrepresentations, its advisors are neither objective nor disinterested. Empower Advisory's advisors have significant financial incentives, including bonuses, commissions, and other additional compensation, which are directly tied to recommendations that retirement plan participants roll assets into Non-Plan Products.

59. Empower Advisory has instructed and trained its advisors across the board not to inform retirement plan participants of the exorbitant fees and expenses associated with moving assets to Non-Plan Products. Empower advisors also repeatedly and across the board failed to provide retirement plan participants with comparative performance information illustrating the differences between employer-sponsored plans with their pooled assets and Defendants' retail Non-Plan Products. Empower advisors were also instructed not to provide or share certain information with retirement plan participants until they had already signed up for a Non-Plan Product, including screenshots and printouts reflecting asset allocation and other information about the Non-Plan Product investments.

60. Empower Advisory also regularly instructed its advisors not to disclose other advantages of employer-sponsored plans as compared to Non-Plan

27

Products, which include, among other things, greater protections from creditors, lower fees, and more flexible withdrawal options. Instead, Empower Advisory instructed its advisors to highlight supposed *disadvantages* of remaining in employer-sponsored plans when pitching Non-Plan Products to prospective clients.[21] To this end, advisors were trained to, among other things, emphasize the disruption to a retirement plan participant's portfolio from transferring retirement balances into employer-sponsored plans each time one changes jobs, and characterize various features of and rules associated with employer-sponsored plans as inferior.

> **B.   Empower's contracts with participants who purchase Non-Plan Products do not disclose Empower's substantial and egregious conflicts of interest.**

61.   When a retirement plan participant accepts the advice of an Empower advisor and purchases advisory services by signing up for a Non-Plan Product, they enter into a contractual relationship with Empower Advisory.

62.   The Advisory Services Agreement ("Agreement") Empower Advisory

---

[21] According to the SEC, "[d]uring Retirement Readiness Reviews, certain [Empower Advisors] routinely spent a significant amount of time discussing the benefits of the Managed Account service while only focusing on the drawbacks of self-managing or investing in a target date fund" and "did not explain that alternative options existed." *In the Matter of Empower Advisory Group, LLC and Empower Financial Services, Inc.*, Release No. 103809 (Aug. 29, 2025), *available at* https://www.sec.gov/files/litigation/admin/2025/34-103809.pdf, *archived at* https://perma.cc/UBE2-MMUE.

entered into with Plaintiffs and members of the class was, in all material respects, uniform.

63.    In the Agreement, Empower Advisory explicitly "**acknowledges that, as a registered investment adviser, it owes a fiduciary duty to participants with respect to the advice it provides**." (emphasis added).

64.    The Agreement also reiterates that the Managed Account program purportedly provides "a personalized investment portfolio" tailored to the needs of the participant. Specifically, in the Agreement's "Description of Services," Empower Advisory states:

> **Managed Account**: The Managed Account service is geared toward users who wish to have investment professionals select among the available investment options and manage their retirement accounts for them. You will receive a personalized investment portfolio that reflects your investment options and your retirement timeframe, life stages and overall financial picture, including assets held outside your account (if you elect to provide this information), which may be taken into consideration when determining the allocation of assets in your account. Generally, AAG will not provide advice for, recommend allocations of, or manage your outside accounts.
>
> Under the Managed Account service, AAG has discretionary authority over allocating your assets among the core investment options without your prior approval of each transaction. AAG is not responsible for either the selection or maintenance of the investment options available within your retirement account or IRA. If available in your account, AAG will not provide advice for, or investment options available within your retirement account or IRA. If available in your account, AAG will not provide advice for, or recommend allocations of, individual stocks (including employer stock), self-directed brokerage accounts, guaranteed certificate funds, employer-directed monies, or any other

29

investment options that do not satisfy the methodology requirements of the IFE, even if they are available for investment in the plan. Your balances in any of these investment options or vehicles may be liquidated, subject to your plan's and/or investment provider's restrictions.

65.    When a retirement plan participant is persuaded, based on Defendants' misrepresentations, to enroll in Empower's Managed Account service, the participant gives Empower Advisory "discretionary authority over allocating [their] assets . . . without [the participant's] prior approval for each transaction."

66.    Underscoring the supposedly "personalized" nature of its Managed Account service, Empower Advisory promises in the Agreement that "Managed Account assets" will be "monitored, rebalanced and reallocated periodically (approximately quarterly) by [Empower Advisory]."

67.    The Agreement also promises that investments in a Managed Account will be based on the same purportedly disinterested, non-conflicted recommendations that Empower Advisory advisers use to mislead participants into purchasing Managed Account services in the first place – Empower Advisory's proprietary Morningstar product:

> **Methodology**: The Advisory Services methodology is powered by Morningstar Investment Management. Morningstar Investment Management first builds stable, consistent asset allocation models at various risk levels. Based on Monte Carlo simulations of the user's resources, liabilities, and human capital, an appropriate asset level portfolio is selected and a savings rate and retirement age are determined that best suits each user's situation. The asset class level

30

model portfolios are revisited annually. Investment options from the account's menu are then selected to implement each asset-level model portfolio. These investment options are monitored and rebalanced periodically (approximately quarterly).

68.     The Agreement acknowledges that "Managed Account services may have allocations that result in [Empower Financial Services] receiving compensation from the investment options" – i.e., that some funds in which Managed Account assets are invested pay fees to an Empower Advisory affiliate.

69.     Nevertheless, Empower Advisory asserts in the Agreement and in its Form ADV filed with the SEC that it "does not believe there is a conflict of interest" because "[t]he compensation paid by [Empower Advisory] to Morningstar Investment Management for [its] proprietary software advice program does not vary based on the allocations made" and "[b]ecause Morningstar Investment Management is unaffiliated with [Empower Advisory] and [Empower Financial Services]."

70.     However, this purported disclaimer does not address the substantial conflict inherent in Empower Advisory's movement of investors' assets into funds that pay money directly to Empower Advisory affiliates.

71.     Nor does this purported disclaimer address the significant conflict that exists as the result of the fact that Empower Advisory limits the universe of potential investment options to Empower Advisory affiliated funds. This results in

31

Empower Advisory affiliates, including Empower Financial Services, receiving substantial *additional* inflated and unreasonable fees from Plaintiffs and members of the class.

### C. Empower misled Plaintiffs into purchasing a Non-Plan Product, enriching Defendants.

72. Empower Advisory's self-serving representation that its advice is not conflicted because of its relationship with Morningstar is a red herring: the conflict exists because Empower Advisory and its advisors *only* recommend services that benefit Empower Advisory and its affiliates, including Empower Financial Services and Empower Annuity.

73. While requiring its advisors to represent that they are providing objective advice in the best interest of retirement plan participants, Empower Advisory restricts its advisors from recommending any investment other than a Non-Plan Product – even though Empower and its advisors owe heightened fiduciary duties to retirement plan participants.

74. By recommending that participants purchase Non-Plan Products – and making only that recommendation – Empower Advisory enriches itself, its advisors, and its affiliates.

75. Retirement plan participants who are persuaded as a result of Defendants' misleading scheme to purchase Non-Plan Products pay multiple layers

of fees for those services.

76.    *First*, Empower Advisory pays itself an Investment Advisory Fee for its Managed Account services. The Investment Advisory Fee is calculated as a percentage of the assets under management ("AUM") that an investor deposits into a Managed Account.

77.    For example, the fee schedule incorporated into Empower Advisory's Form ADV and other disclosure documents provides that Empower Advisory will pay itself an Investment Advisory Fee of up to over half a percent (.55%) of the amount a retirement plan participant deposits into Empower's Managed Account:[22] This percentage is higher than that of pooled investments in a company 401(k) plan because it is a retail rate.

| Principal Account Balance | Quarterly Fee | Annualized Quarterly Fee |
|---|---|---|
| < $100,000 | 0.1375% | 0.55% |
| Next $150,000 | 0.1125% | 0.45% |
| Next $150,000 | 0.0875% | 0.35% |
| > $400,000 | 0.0625% | 0.25% |

78.    Empower Advisory charges up to this Investment Advisory Fee nationwide for its Managed Account service across all its divisions.

79.    As discussed above, Empower Advisory pays itself this sizeable fee

---

[22] Form ADV (filed Mar. 22, 2019), p. 8, ADVISED ASSETS GROUP, LLC, from SEC database *available at* https://www.sec.gov/foia/form-adv-part-2-data-archive, *archived at* https://perma.cc/3LMG-KTCX.

purportedly for the personalized investment advice it promises both before and when a participant purchases Empower's Managed Account services.

80.    But Empower Advisory does not provide individualized investment advice for participants purchasing Empower's Managed Account services.

81.    Instead, Empower's Managed Account service utilizes software that automatically assigns retirement plan participants to one of seven preset asset allocations.

82.    *Second*, not only does Empower Advisory pay itself an Investment Advisory Fee, but the investment funds into which Empower Advisory invests retirement plan participants' assets pay *additional* fees to Defendants.

83.    Specifically, when a retirement plan participant is convinced by an Empower Advisory sales representative to put his or her retirement plan assets into a Managed Account, Empower Advisory uses those assets to purchase a basket of individual funds that mirror investments in the broader market.

84.    These funds each charge investors *additional* Fund Fees. Moreover, many – and, for most of Empower Advisory's seven preset asset allocations, *all* – of these funds are directly or indirectly owned by Empower affiliates. Thus, Empower is charging participants fees to recommend its own proprietary products and funds, each of which charges another layer of fees.

85.    These Fund Fees, which are paid to Empower Advisory affiliates, cost

34

retirement plan participants an extra 80 basis points (.80%) or more. This is in addition to the up to 55 basis points (.55%) retirement plan participants already pay Empower Advisory for the Investment Advisory Fee.

86. In other words, retirement plan participants who Empower Advisory misleads into purchasing high-fee laden Empower Managed Accounts ultimately pay Empower Advisory and its affiliates up to 1.35% – 135 basis points – of the amount they deposit into their Empower Managed Account, which is multiple times more than the institutional rate that non-retail investors pay. The only "benefit" the retirement plan participant receives is that a computer program slots the participant into one of seven preset asset allocations primarily (or exclusively) populated with Empower-affiliated funds.

87. The fact that many, and in most cases all, of the funds available to retirement plan participants if they purchase Defendants' Managed Account services are Empower-affiliated is not disclosed to retirement plan participants before they purchase Defendants' Managed Account services.

## RELEVANT LEGAL STANDARDS

**I.      ERISA imposes strict standards of conduct on plan fiduciaries and categorically prohibits harmful self-dealing transactions.**

**A.      ERISA defines "fiduciary" in functional terms based on plan-related conduct.**

88. At common law, fiduciary obligations are attached only to the entity

formally designated in the trust instrument. ERISA similarly requires a written plan document that identifies one or more "named fiduciaries" with authority to control and manage the operation and administration of the plan, which is usually the employer that sponsors the plan. But ERISA takes a far more expansive approach than the common law, extending fiduciary status to those who undertake certain plan-related functions. Thus, "an individual or entity can still be found liable as a 'de facto' fiduciary if it lacks formal power to control or manage a plan yet exercises informally the requisite 'discretionary control' over plan management and administration." *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1101–02 (9th Cir. 2004); *In re Allergan Erisa Litig.*, No. 17-1554, 2018 U.S. Dist. LEXIS 112127, at *7 (D.N.J. July 2, 2018).

89.    ERISA's three-pronged functional "fiduciary" definition states that "a person is a fiduciary with respect to a plan to the extent":

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

> (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

36

29 U.S.C. § 1002(21)(A). Courts have an "obligation to liberally construe fiduciary status under ERISA." *Dawson-Murdock v. Nat'l Counseling Grp., Inc.*, 931 F.3d 269, 278 (4th Cir. 2019). As discussed herein, Empower Advisory, Empower Annuity, Empower Retirement, and Empower Financial Services met this fiduciary definition by rendering investment advice for a fee and otherwise exercising authority and control over plan management and administration.

90.    Empower Advisory itself is not only a Registered Investment Advisor, which renders it a fiduciary, but also expressly represents to participants that, as a Registered Investment Advisor, it "owes a fiduciary duty to participants with respect to advice it provides." *See supra* ¶ 63. Moreover, Empower Advisory represents to participants that its advisors "will be giving them fiduciary, best interest advice." *See supra* ¶ 52.

91.    The Plan Sponsors of the plans at issue are also fiduciaries.

**B.    ERISA fiduciaries must act prudently and exclusively in the best interests of retirement plan participants.**

92.    To effectuate ERISA's primary purpose of protecting the retirement security of plan participants, "Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive." *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993). ERISA's strict fiduciary standards of prudence and

37

loyalty are derived from the common law of trusts and are "*the highest known to the law*." *Bierwirth*, 680 F.2d at 272 n.8 (emphasis added).

93.     Most fundamentally, ERISA fiduciaries are subject to an unyielding duty of loyalty. *See Pegram v. Herdrich*, 530 U.S. 211, 224–25 (2000). The statute states in relevant part that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Put simply, the fiduciary must act "with an eye single to the interests of the participants and beneficiaries." *Bierwirth*, 680 F.2d at 271 (citing Restatement of Trusts 2d § 170 (1959), II Scott on Trusts § 170, at 1297–99 (1967), and Bogert, The Law of Trusts and Trustees § 543 (2d ed. 1978)); *Reich v. Compton*, 57 F.3d 270, 291 (3d Cir. 1995).

94.     A fiduciary also must act prudently – "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). To fulfill this duty, the fiduciary must investigate and evaluate investments and exercise the sound judgment of a knowledgeable and impartial financial expert in making investment decisions or formulating investment advice.

95.     The duty of prudence extends to the selection of service providers,

38

such as recordkeepers. *See Hughes v. Nw. Univ.*, 595 U.S. 170, 174 (2022) (handled by undersigned counsel Schlichter Bogard LLC).

96.     Because the content of the duty of prudence depends on the surrounding circumstances, the requisite level of care may vary based on the circumstances facing the fiduciary. The personal data of a plan's participants is highly sensitive and confidential. Because fiduciaries are entrusted with sensitive participant data, they must exercise the highest care to ensure its safety and security.

97.     The U.S. Department of Labor advises that "[p]lan sponsors should use service providers that follow strong cybersecurity practices." U.S. Dep't of Labor ("DOL"), *Tips for Hiring a Service Provider with Strong Cybersecurity Practices* 1 ("*DOL Tips*") (Apr. 14, 2021), https://www.dol.gov/sites/dolgov/files/ebsa/key-topics/retirement-benefits/cybersecurity/tips-for-hiring-a-service-provider-with-strong-security-practices.pdf, *archived at* https://perma.cc/HLR7-WMEA. It further advises that doing so "help[s] business owners and fiduciaries meet their responsibilities under ERISA to prudently select and monitor such service providers." *Id.*

98.     Objectively prudent fiduciaries select service providers that safeguard the personal data of retirement plan participants and take steps to ensure that recordkeepers maintain the integrity of participants' data. Plan sponsors who fail to

39

take steps to ensure that service providers protect participants' data and use such data only for proper purposes breach their fiduciary duties.

99.    By way of example, it is indisputable that fiduciaries could not, consistent with ERISA's strict duties of prudence and loyalty, sell participants' Social Security numbers to the highest bidder, nor auction off information about participants' choices for their retirement investments, the amounts of their retirement assets, their years until retirement, their habits regarding changes to their investment approach, or any other highly confidential personal financial information. It follows that they may not allow third-party service providers to abuse their access to sensitive data to enrich themselves through misleading or predatory sales tactics. Yet, using plan participants' highly sensitive, confidential information is exactly what Empower Advisory is doing and doing for itself.

100.    A fiduciary also cannot turn a blind eye to the breach of its co-fiduciary. In addition to any liability a fiduciary has for its own breach, a fiduciary is also liable for knowingly participating in, concealing, or failing to remedy a co-fiduciary's breach of duty. *See* 29 U.S.C. § 1105(a).

101.    To supplement the fiduciary duty of loyalty, Congress also prohibits *per se* certain transactions deemed likely to injure a plan, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary may be inclined to favor at the expense of the plan

40

beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241−42 (2000); 29 U.S.C. § 1106(a)–(b). An entity providing services to a plan is a party in interest. 29 U.S.C. § 1002(9), (14)(B).

102.   Although certain otherwise prohibited transactions may be eligible for an exemption, the necessary conditions for relief generally require the fiduciary to show that the transaction serves the participants' interests rather than the fiduciary's or service provider's interests and involves no more than reasonable compensation.

**C.     Congress authorized participants to enforce fiduciary obligations through actions to recover losses and ill-gotten profits.**

103.   To enforce ERISA's fiduciary obligations, Congress authorized participants to bring a civil action to obtain legal and equitable remedies for their plans, 29 U.S.C. § 1132(a)(2). The relief available in a § 1132(a)(2) action includes restoration of plan losses caused by the breach or violation as well as restoration to the plan "any profits of such fiduciary" made "through use of assets of the plan by the fiduciary." 29 U.S.C. § 1109(a).

104.   ERISA further authorizes participants to bring a civil action "to obtain other appropriate equitable relief (i) to redress such violations [of any provision of this subchapter] or (ii) to enforce any provisions of this subchapter," 29 U.S.C. § 1132(a)(3). Appropriate equitable relief includes monetary remedies such as

41

surcharge, disgorgement of profits, and a constructive trust.

105.    Even after a participant's assets are distributed from the plan, the participant retains statutory standing to pursue actions to impose a constructive trust on ill-gotten profits realized from a breach of the duty of loyalty, and the proceeds of the constructive trust are properly distributed to the participants. *See Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1409–19 (9th Cir. 1988). To hold otherwise would frustrate the well-established trust principle that a fiduciary may not profit by breaching the duty of loyalty. If there is no financial incentive to breach, a fiduciary will be less tempted to engage in disloyal transactions. Although class members here suffered financial damage, a showing of actual harm is immaterial to an action to recover a fiduciary's ill-gotten profits.

## II.    Defendants acted as ERISA fiduciaries.

### A.    Defendants acted as fiduciaries by issuing self-interested investment advice from which they reaped massive profits.

106.    The second prong of ERISA's definition of "fiduciary" provides that "a person is a fiduciary with respect to a plan to the extent he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." 29 U.S.C. § 1002(21)(A)(ii).

42

107.    Under the statute's plain text, Defendants, acting through advisors under their direction and control, rendered investment advice with respect to ERISA plan moneys each time an advisor executed Defendants' sales process and advised ERISA retirement plan participants how they should invest.

108.    Under the statute's plain text, Defendants received a fee or other compensation, direct or indirect, for providing advice. Indeed, the investment advice provided through the sales process was "included" in the bundle of services for which Defendants were compensated through the administrative fees they collected. Moreover, each time a participant followed Defendants' investment advice and moved assets to a Non-Plan Product, Defendants received substantial fees. Under the plain meaning of the statute, nothing more is required to establish fiduciary status.

109.    The result is the same under applicable regulatory guidance, to the extent the plain meaning of the statute does not control: Defendants are ERISA fiduciaries to the extent they provided investment advice recommending that ERISA plan participants roll their plan accounts into Non-Plan Products. *See* 29 C.F.R. § 2510.3–21(c)(1).

110.    Defendants, through their advisors, rendered advice and made "recommendation[s] as to the advisability of investing in, purchasing, or selling securities or other property." *See* 29 C.F.R. § 2510.3-21(c)(1)(i).

111.    The advice was provided on a "regular basis" within the meaning of the regulation, 29 C.F.R. § 2510.3-21(c)(1)(ii)(B), because the advice was not a one-time occurrence, but instead occurred as part of an ongoing relationship between the advisor and participants, and Defendants' communications made clear that Empower Advisory was available on an ongoing basis. The advice was also the beginning of an intended future ongoing relationship between the participant and Defendants through Empower's Non-Plan Products.

112.    As part of Defendants' sales process, advisors informed retirement plan participants that the advice relationship would continue after a participant rolled over assets, and that Defendants would continue to provide updated, individualized advice tailored to the participant's needs in the years to come delivered on a regular basis. Advisors also promised regular, periodic check-ins in connection with Non-Plan Products. In addition to these check-ins, advisors informed participants they could call for advice. For example, after opening their Non-Plan Product accounts, Plaintiffs Patton and Williams-Linzey had regular investment advice discussions over a period of years with advisors employed by Empower. Ms. Williams-Linzey's discussions with advisors took place within this District, in Somerset, New Jersey.

113.    In addition to providing investment advice on a regular basis to individual retirement plan participants, Defendants also provided investment

44

advice on a regular basis to ERISA-governed plans in which class members participated. When a plan hires Defendants, the standard package of services that Defendants provide to the plan allows Defendants to separately offer retirement advisory services, which includes online investment guidance, advice, and the Non-Plan Product services. Defendants' provision of retirement advisory services to plans occurred continuously throughout the class period, and these services were available to all participants in each plan.

114. Throughout the class period, Defendants used participants' highly confidential personal information to systematically create lists of pre-selected participants in client plans, which Defendants then regularly distributed to advisors to initiate Defendants' sales process. Defendants' advisors then cold-called preselected retirement plan participants and rendered investment advice to these participants while persuading them to move their retirement plan assets to Non-Plan Products.

115. Defendants additionally provided "individualized investment advice" within the meaning of the regulation. 29 C.F.R. § 2510.3-21. As set forth above, Defendants improperly harvested highly confidential financial information, to which Defendants had privileged access, in order to create lists of retirement plan participants to target with marketing efforts. Defendants' advisors then used those lists as an integral part of Defendants' sales process – a process that culminated in

45

Defendants' creation of financial plans, which incorporated an individual's particular "pain points," "landmines," and financial planning needs.

116. Defendants' investment advice was additionally provided pursuant to a mutual understanding that the advice would serve as a primary basis for investment decisions. *See* 29 C.F.R. § 2510.3-21(c)(1)(ii)(B). Indeed, Defendants' express goal was to induce plan participants to rely on their investment advice as the basis for a participant's decision to roll assets out of a retirement plan and into an Empower Non-Plan Product.

117. Further, Defendants' contracts with plan fiduciaries are based on the mutual understanding that Defendants will provide investment advice to plan participants, whose accounts hold the assets of the entire plan; that such advice will serve as the primary basis for participants, who lack the expertise of sophisticated financial expert like Defendants, to make decisions on how the plan's assets will be invested; and that such advice will be individualized based on the particular needs of each participant and his or her investment strategy or goals. Thus, Defendants' conduct satisfies 29 C.F.R. § 2510.3-21(c)(1)(ii)(B). Yet, the across-the-board advice Defendants provided to plan participants was to invest assets in Non-Plan Products, in Defendants' self-interest.

118. Empower Retirement cannot avoid liability by arguing that another wholly owned Empower Annuity subsidiary, Empower Advisory, actually

46

provided the advice, not Empower Retirement itself. Fiduciary status attaches if the entity provides investment advice "either directly or indirectly (*e.g.*, through or together with any affiliate)." 29 C.F.R. § 2510.3-21(c)(1)(ii).

119.   Empower Advisory and Empower Retirement are both "affiliate[s]" of Empower Annuity within the meaning of the regulation because Empower Annuity has "the power to exercise a controlling influence over [their] management or policies." 29 C.F.R. § 2510.3-21(e)(2). Empower Advisory's financial statements acknowledge that it is a "wholly owned subsidiary" of Empower Annuity.

**B.     Empower exercised authority and control over plan management and administration in other ways.**

120.   In addition to being a Registered Investment Advisor, and admitting it acts as a fiduciary, Empower Advisory has the status of a fiduciary by providing the fiduciary investment advice described above. Moreover, Empower Advisory acted as an ERISA fiduciary in other ways.

121.   An entity "is a fiduciary with respect to a plan to the extent" "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," or "(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

47

122.   Empower Retirement serves as recordkeeper to thousands of ERISA-governed defined contribution plans. Although Empower Retirement's formal recordkeeping role involves certain ministerial tasks such as keeping track of participants' account balances, it abused its position and exceeded the bounds of its formal authority to exercise discretion and control over plans' management, operations, and administration by unilaterally exercising greater discretion and control over plan operations through the practices set forth above.

123.   Data about a plan's participants is critical to the operation of a retirement plan. To accurately perform its recordkeeping function in a defined contribution plan, Empower Retirement received access to highly sensitive, confidential data about the plan's participants – that could include, for example, age, length of employment, employment information and income, social security number, account balance, contact information, years until retirement age, and investment selections, and transaction histories.

124.   But Empower Retirement did not use this data solely to perform the ministerial tasks formally assigned to it. Instead, Empower Retirement improperly appropriated this confidential information, using its access to this confidential information to aggressively market its high-cost Non-Plan Products, and thereby generate profits for itself at participants' expense.

125.   Empower Retirement used its position as the plan's recordkeeper –

48

and its access to confidential data about plan participants – to identify promising high-asset sales targets and target individuals nearing retirement age who were likely to move assets.

126.   In so doing, Empower Retirement exceeded the bounds of its formal authority and exercised discretion and control over the way the plans were managed and administered – fiduciary conduct. 29 U.S.C. § 1002(21)(A)(i), (iii).

127.   Worse still, Empower Retirement exercised such discretion and control *for the purpose of profiting at the expense of the plans' participants*, including Plaintiffs and class members.

## III.    Defendants knowingly received ill-gotten profits produced by Plan Sponsors' ERISA violations.

128.   As noted, Empower Retirement's standard package of services to its client plans includes personalized investment advice with plan participants provided through Empower Advisory. Even if such advice did not create fiduciary relationships of trust and confidence, Empower Retirement remains subject to liability under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). While ERISA §§ 409(a) and 502(a)(2) impose liability only on plan fiduciaries, § 502(a)(3) "admits of no limit . . . on the universe of possible defendants." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc*., 530 U.S. 238, 246 (2000). Thus, a defendant may be held liable under § 502(a)(3) even if it is not an ERISA fiduciary, if the

49

defendant "knowingly participates" in an ERISA fiduciary's violation.

129.   Under the trust law in which ERISA is rooted, "it has long been settled that when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust, unless he has purchased the property for value and without notice of the fiduciary's breach of duty. The trustee or beneficiaries may then maintain an action for restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom." *Id*. at 250 (citing Restatement (Second) of Trusts §§ 284, 291, 294, 295, 297 (1959)).

130.   A transferee with actual or constructive knowledge of the circumstances constituting the breach of duty or rendering the transaction unlawful may be held liable for restitution.

131.   The Plan Sponsors of the plans in which Plaintiffs and proposed class members participated are ERISA fiduciaries because they are named as fiduciaries under the plan documents or exercised fiduciary discretion by hiring Empower Retirement as a plan service provider.

132.   As such, the Plan Sponsors were subject to ERISA's duties of loyalty and prudence and were bound by ERISA's prohibited transaction provisions. However, the Plan Sponsors – including the fiduciaries of the plans in which

Plaintiffs and class members participated – failed to monitor and investigate Empower's conduct and compensation and implement restrictions to protect participants from being duped into high-cost rollovers that would deplete their hard-earned retirement savings. The Plan Sponsors who allowed Empower to sell its Non-Plan Products thus failed to act as prudent fiduciaries would have under the circumstances and caused prohibited transactions.

## A.    A prudent fiduciary would have restricted Empower's cross-selling activities and monitored Empower's cross-selling revenues.

133.    ERISA's duty of prudence is an objective standard derived from the common law of trusts. *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984). Because fiduciaries are held "to the standards of others 'acting in a like capacity and *familiar with such matters*,'" a lack of knowledge or expertise is not a defense. *Id*. (quoting 29 U.S.C. § 1104(a)(1)(B)) (emphasis added). Thus, an ERISA "fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field." *Sweda*, 923 F.3d at 329. "[A] pure heart and an empty head are not enough." *Id*. Determining what a hypothetical prudent fiduciary would have known, and how such a fiduciary would have acted under the circumstances, involves questions of fact. Here, a prudent fiduciary acting in the best interests of plan participants would have (1) implemented measures to protect participants against Empower's conflict of interest, and (2) monitored Empower's cross-selling

51

revenues.

### 1.    Cross-selling restrictions

134.    As a factual matter, a prudent expert in the field would have been aware of the issue of cross-selling in defined-contribution plans by the start of the class period, and would have prohibited it. In January 2011, the Government Accountability Office ("GAO") issued a report finding that "industry experts" at the time were aware of the "conflicts of interest" that arise when a recordkeeper markets its non-plan products to a plan's participants.[23] As the GAO described the problem:

> Cross-selling products outside of a plan to participants can substantially increase a service provider's compensation, which creates an incentive for the service provider to steer participants toward the purchase of these products even though such purchases may not serve the participants' best interest. For example, products offered outside a plan may not be well suited to participants' needs or participants may be able to secure lower fees by choosing investment funds within their plans comparable with products offered outside their plan.

*Id*.

135.    A second report, issued in March 2013, found that service provider representatives had encouraged rollovers from employer-sponsored plans to IRAs

---

[23] United States Gov't Accountability Office, Report to Congressional Requesters, 401(k) Plans, *Improved Regulation Could Better Protect Participants from Conflicts of Interest*, at 36 ("2011 GAO Study"), *available at* https://www.gao.gov/products/gao-11-119, *archived at* https://perma.cc/C3F5-ASE3.

"even with only minimal knowledge of a caller's financial situations."[24]

136.  The 2011 GAO Study (at 36) explicitly noted that "[p]lan sponsors can take steps to preclude service providers from cross-selling non-plan products and services to plan participants," such as requiring the service provider to sign a non-solicitation agreement.

137.  In fact, sponsors of numerous defined-contribution plans outside of the proposed class[25] have prevented recordkeepers from cross-selling investment products and services outside of their plans through contract terms that prohibit

---

[24] United States Gov't Accountability Office, Report to Congressional Requesters, 401(k) Plans, *Labor and IRS Could Improve the Rollover Process for Participants* (March 2013), *available at* https://www.gao.gov/assets/660/652881.pdf, *archived at* https://perma.cc/4LZB-58WU. Also in 2013, the Financial Industry Regulatory Authority (FINRA) released a "Report on Conflicts of Interest" which emphasized, among other things, the importance of monitoring the appropriateness of advisor "recommendations around key liquidity events in an investor's life, for example, at the point when an investor rolls over her pension or 401(k)." FINRA, *Report on Conflicts of Interest*, at 4, 27, 31 (Oct. 2013), *available at* https://www.finra.org/sites/default/files/Industry/p359971.pdf, *archived at* https://perma.cc/56EV-8XP5. These events may heighten conflicts of interest because of the large sums of money that may be involved." *Id*. "Firms have a strong incentive to gather assets" and "[t]he recommendations a[n] [advisor] makes at these points in time may have profound implications for the investor and deserve thorough scrutiny and review." *Id*.

[25] Defendants' clients represent a small fraction of the more than 600,000 ERISA-governed defined-contribution plans in the United States. *See* U.S. Dep't of Labor, *Private Pension Historical Tables and Graphs 1975–2020*, Table E1 (Oct. 2022), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/researchers/statistics/retirement-bulletins/private-pension-plan-bulletin-historical-tables-and-graphs.pdf, *archived at* https://perma.cc/ZVU8-D973.

cross-selling and the use of participants' data for marketing or purposes other than administrative and recordkeeping functions.

138.   A prudent fiduciary acting in participants' interests would understand that the need to monitor service providers' conduct is particularly acute when the service provider is entrusted with sensitive data about the plan's participants. The DOL has recognized the duty to ensure that participants' data is protected by advising that the duty to prudently select and monitor service providers includes ensuring that service providers have "strong cybersecurity practices." *DOL Tips* at 1. Thus, an objectively prudent fiduciary would take steps to ensure that participants' sensitive data is not unnecessarily exposed to the risk that it could be improperly obtained and misused by third parties. A prudent fiduciary who discovers that a service provider *itself* is misusing retirement plan participants' data to enrich *itself*, at the expense of retirement plan participants, would not allow the practice to continue. Because of Empower's deceptive conduct described above, the Plan Sponsors were universally unaware of Empower's cross-selling activity and allowed it to proceed unabated for years. A prudent fiduciary would have taken steps to immediately restrict further misuse of retirement plan participants' data.

### 2.    Monitoring all sources of revenue

139.   ERISA explicitly requires that administrative expenses and service

provider compensation be "reasonable" for the services provided. *See* 29 U.S.C. §§ 1104(a)(1)(A)(ii), 1108(b)(2)(A). Thus, allowing a service provider to receive more than reasonable compensation constitutes both a fiduciary breach and a non-exempt prohibited transaction. 29 U.S.C. §§ 1104(a)(1)(A)–(B), 1106(a)(1)(C), 1106(a)(1)(D), 1108(b)(2)(A).

140.   All sources of compensation received by the service provider in connection with its services to the plan, including "indirect" compensation from sources "other than the covered plan" are included in what constitutes a reasonable fee for services. *See* 29 CFR § 2550.408b–2(c)(viii)(B)(2) (defining "indirect compensation").

141.   If the fiduciary fails to quantify all sources of a service provider's compensation, it becomes impossible for the fiduciary to adequately monitor the provider's total compensation.

142.   Cross-selling can provide a very substantial source of revenue to defined-contribution plan recordkeepers, often representing multiples of actual recordkeeping fees. As the GAO concluded in 2011, cross-selling "can substantially increase a service provider's compensation" and "cross-selling IRA rollovers to participants, in particular, is an important source of income for service providers." 2011 GAO Study at 36. For example, "a service provider could earn $6,000 to $9,000 in fees from a participant's purchase of an IRA, compared with

$50 to $100 in fees if the same participant were to invest in a fund within a plan."

*Id.*

143.   Because of Empower's deceptive conduct, the Plan Sponsors were unaware of Empower's substantial cross-selling revenue and did nothing to monitor it for years.

**B.    The class members are participants in plans whose Plan Sponsors failed to prevent Defendants' cross-selling activities.**

144.   Defendants' strategy to grow their rollover business – accomplished through, among other things, Defendants' advisors' false representations of objectivity and misleading portrayals of Non-Plan Product services – resulted in a massive increase in Defendants' annual revenues generated from assets transferred into Non-Plan Products.

145.   The steadily increasing revenues that Defendants achieved due to the misleading practices described herein show that the Plan Sponsors failed to ban cross-selling or monitor Empower's compensation from Non-Plan Products. Empower's advisors failed to inform the Plan Sponsors, Plaintiffs, and class members that investors typically incur far higher fees by investing in Non-Plan Products than by remaining invested in their employer-sponsored retirement plans, which frequently offer similar managed account services free of charge.

146.   The participants in plans whose Plan Sponsors allowed Defendants'

cross-selling are the victims of Defendants' practices set forth herein. Had the fiduciaries implemented the measures of a prudent fiduciary by restricting cross-selling, Defendants' revenues would not have increased significantly during the relevant time period.

147. By way of specific example, Plaintiff McFarland executed a rollover to an Empower Managed Account from the Global Medical Response, Inc. 401(k) Plan in reliance on investment advice from an advisor employed by Defendants. Ms. McFarland had numerous regular interactions with Defendants' advisor before rolling her assets out of her plan to the Empower Managed Account. Throughout the course of these interactions, Empower's representative disavowed any conflict of interest, did not disclose the fact that the advisor had a financial incentive to recommend a Non-Plan Product, and represented to Ms. McFarland that Defendants were providing a personalized service they would "watch carefully" and were "looking out" for the best interests of Ms. McFarland. The advisor also failed to inform Ms. McFarland that the fees and expenses of moving assets to a Managed Account were higher than remaining in her employer-sponsored plan. Accordingly, the fiduciaries of the Global Medical Response, Inc. 401(k) Plan failed to restrict Defendants' cross-selling activities.

148. Plaintiffs Patton and Williams-Linzey had similar experiences with multiple ongoing interactions with Defendants' representatives in advance of Non-

Plan Products rollovers from their employer-sponsored retirement plans. Empower advisors minimized or denied any conflict of interest and did not present Plaintiffs Patton or Williams-Linzey with comparative information material to the rollover decision. Thus, the fiduciaries of their plans also evidently failed to implement the restrictions on Defendants' cross-selling.

### C.    The Plan Sponsors failed to prudently investigate Defendants' cross-selling revenues.

149.    Separate from the breaches of duty described in the preceding section, the Plan Sponsors also failed to properly account for Defendants' cross-selling revenues, resulting in additional fiduciary breaches and prohibited transactions.

150.    As discussed above, based on guidance from the DOL, a fiduciary cannot prudently monitor and control fees unless the fiduciary knows the *amount* of the compensation. Because of Empower's deception, the Plan Sponsors allowed cross-selling and failed to monitor and control Empower's cross-selling revenues because Defendants concealed these revenues. The fact that Empower's Non-Plan Product revenues significantly and continuously escalated during the class period, further, strongly supports the conclusion that Plan Sponsors failed to monitor Empower Retirement's cross-selling revenues.

151.    The illustration below shows the effect of non-plan product sales,

58

such as sales of Non-Plan Products, on a recordkeeper's total compensation:[26]



152.   In the above example, the "opaque" recordkeeper charges an annual

---

[26] Dan Alexander and Marla Kreindler, Fiduciary Diligence, Best Practices, Lawsuits and Lessons Learned, NAGDCA Annual Conference, at 11, (Sept. 8, 2019), *available at* https://www.nagdca.org/wp-content/uploads/2019/09/2019-NAGDCA-Annual-Fiduciary-Diligence-Best-Practices-Lawsuits-and-Lessons-Learned.pdf, *archived at* https://perma.cc/7WR4-HE8U.

administrative fee of three basis points (i.e., 0.03%), whereas the "transparent" provider charges an annual administrative fee of ten basis points (i.e., 0.10%). The "opaque" recordkeeper, however, generates more than 2.5 times the revenue of the "transparent" recordkeeper, despite providing no additional services, based mostly on sales of non-plan products. Defendants similarly received significant revenues based on improperly leveraging relationships and selling Non-Plan Products.

153.   By causing their plans to allow Empower Retirement to engage in cross-selling for Defendants' benefit, the Plan Sponsors caused their plans to engage in prohibited transactions with a party in interest. 29 U.S.C. § 1106(a)(1)(D).

154.   Empower Retirement's cross-selling activities and its provision of self-interested investment advice were not services necessary for the operation of the plans.

**D.    Defendants knew that Plan Sponsors failed to ban cross-selling and failed to inquire into Empower's cross-selling revenues.**

155.   As set forth above, Defendants knew that Plan Sponsors were not monitoring or restricting Defendants' cross-selling activities, knew of the circumstances that rendered the Plan Sponsors' conduct a breach of fiduciary duty, and knew of the circumstances that rendered unlawful the transactions involving Defendants' services and use of plan assets.

156.    Defendants knew that the Plan Sponsors failed to (i) monitor Defendants' cross-selling activities and the manner in which Defendants were using participant data; and (ii) ban Defendants' cross-selling practices.

157.    Defendants also knew of the Plan Sponsors' failure to inquire into the amount of Defendants' cross-selling revenues. Thus, Defendants also knew that Plan Sponsors failed to account for Defendants' cross-selling revenues when monitoring Defendants' compensation.

158.    Defendants knew of Plan Sponsors' misconduct in (i) causing plans to hire and retain Defendants as a service provider receiving unreasonable compensation, and (ii) allowing Defendants to engage in unchecked cross-selling, which resulted in the transfer of assets to Defendants.

159.    Defendants directly participated in and enabled the Plan Sponsors' fiduciary breaches referenced above by engaging in cross-selling, by knowingly receiving transfers of plan assets and unreasonable compensation, and by failing to disclose to Plan Sponsors the extent of Defendants' cross-selling revenues and that Defendants' advisors were engaging in false and misleading practices.

## IV.    Defendants engaged in fraudulent concealment of their conduct.

160.    In an ERISA breach of fiduciary duty action involving "fraud or concealment," the action "may be commenced not later than six years after the date of discovery of such breach or violation." 29 U.S.C. § 1113. Because Plaintiffs'

61

claims sound in fraud, this period automatically applies: Defendants "breached [their] duty by making a knowing misrepresentation or omission of a material fact to induce an employee/beneficiary to act to his detriment." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 190 (2d Cir. 2001).

161. Plaintiffs did not discover the full scope of Defendants' fraud, breaches of fiduciary duty, and prohibited transactions until recently. Accordingly, the proper starting date for the class period is the date that Defendants commenced their fraudulent course of conduct, January 1, 2015.

162. Not only do Plaintiffs' underlying claims arise from fraudulent concealment in violation of ERISA, but Defendants also fraudulently concealed their misconduct by failing to disclose to Plaintiffs the financial conflicts that existed to incentivize Defendants to recommend their Non-Plan Products program, including incentives paid to advisors and fund fees paid to Empower. Empower and its advisors also concealed their misconduct by failing to disclose material information that would allow Plaintiffs to compare Non-Plan Products to less expensive and better performing alternative options available in Plaintiffs' employer-sponsored plans and elsewhere. As discussed above, Defendants not only actively instructed advisors to conceal the *advantages* of remaining in employer-sponsored plans, Defendants affirmatively instructed advisors to highlight purported *disadvantages* of remaining in employer-sponsored plans in order to

mislead Plaintiffs into purchasing Non-Plan Products. Defendants also concealed the fact that the software used to generate Empower's Non-Plan Product recommendation was not personalized or objective as they represented, but rather it produced only one recommendation – to purchase Empower's Non-Plan Products. Each of these acts of concealment prevented Plaintiffs from discovering the full scope of Defendants' breaches of fiduciary duties.

163.    In ERISA cases, courts often must look to "[t]he common law of trusts, which offers a starting point for analysis." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250 (2000); *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015) (handled by undersigned counsel). At common law, one who has a duty to disclose "because of a fiduciary or other similar relation of trust and confidence" commits fraud by "fail[ing] to disclose material information" that the beneficiary is entitled to know. *Chiarella v. United States*, 445 U.S. 222, 228 (1980); *Lenz v. Assoc. Inns & Restaurants Co of Am.*, 833 F. Supp. 2d 362, 372 (S.D.N.Y. 1993) ("[F]raudulent concealment occurs if the party under the fiduciary duty fails to meet its obligations to inform the other party of facts underlying the claim."); Restatement (Second) of Trusts § 173, comment d (1959) (trustee has duty to disclose information the beneficiary needs to know for his protection).

164.    When a fiduciary takes affirmative steps to hide its breach that prevent plaintiffs from discovering the alleged breach at an earlier time, as is the

63

case here, the "fraud or concealment" exception applies to extend the statute of limitations beyond six years from the date of the fraudulent concealment. *Ranke v. Sanofi-Synthelabo Inc.*, 436 F.3d 197, 203 (3d Cir. 2006). "[T]here must be conduct beyond the breach itself that has the effect of concealing the breach from its victims." *Id*. at 205. "[A] fiduciary's act of responding to questions in a manner that diverted the beneficiary from discovering a prior misrepresentation" could suffice. *Id*. at 204 (citing *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 242 F.3d 497, 504 (3d Cir. 2001)).

165.   Defendants engaged in acts that hindered the discovery of their breaches of fiduciary duty, constituting concealment. *Caputo*, 267 F.3d at 190; *Ranke*, 436 F.3d at 203–05. Among other things, Defendants falsely claimed that they were adhering to their fiduciary obligations to ensure that investment advice was objective and in participants' best interests, when in reality their advice was blatantly conflicted because Empower's so-called "objective" advisors received financial compensation for recommending Non-Plan Products, which was concealed from Plaintiffs. Further, advisors did not disclose to, and concealed from Plaintiffs information regarding Defendants' receipt of additional compensation through underlying fund fees. Defendants' misrepresentations that their advisors were objective and not compensated through commissions further prevented Plaintiffs and class members from discovering Defendants' wrongdoing.

Defendants' misleading portrayal of Non-Plan Products as superior to employer-sponsored plans and Defendants' failure to provide information that would have allowed Plaintiffs to compare potentially cheaper and better performing options also constituted concealment because these actions prevented class members from discovering the true scope of Defendants' misconduct.

166. The advisor, as well as the substance, context, and time of the misrepresentations to, and omissions from, Plaintiffs McFarland and Williams-Linzey are as follows.

167. Plaintiff McFarland was induced to open a Managed Account through a series of ongoing conversations over a significant period of time she had with Empower advisors in 2022, two and a half years prior to her planned retirement date. These conversations caused Ms. McFarland to begin making withdrawals from her employer's 401(k) plan, and at that time Empower recommended their Managed Account.

168. Empower promised that its Managed Account services would provide Ms. McFarland with personalized oversight, personalized services, and active monitoring, and that she would benefit from Empower "more carefully" monitoring her investments. The advisors Ms. McFarland spoke with represented that Empower would contact her to discuss allocation recommendations and other investment recommendations and actions as part of its ongoing and continuous

65

advice.

169.   The Empower advisors did not inform Ms. McFarland of any potential conflict of interest in recommending Defendants' Managed Account services, or that Defendants might benefit financially by making that recommendation. During Ms. McFarland's conversations with Defendants' advisors, the advisors did not disclose the fees associated with the Managed Account program, or how those fees related to the fees associated with other available investment options.

170.   Defendants' advisors also failed to inform Ms. McFarland that the fees and expenses of moving assets to the Managed Account program were higher than those she would incur by remaining in her employer-sponsored retirement plan, and failed to explain to Ms. McFarland that paying higher fees would reduce the value of her retirement assets over time. Defendants' advisors also failed to disclose data to Ms. McFarland showing the projected performance of Empower Managed Accounts compared to the projected performance of her portfolio if she remained in her employer-sponsored retirement plan.

171.   Plaintiff Williams-Linzey was convinced to open a Self-Directed IRA through highly misleading ongoing conversations she had with Empower advisors, including Gabriel Ward. In 2022, Ms. Williams-Linzey's plan, the Central Jersey Family Health Consortium 403(b) Pension Plan, transitioned recordkeepers from Metropolitan Life to Empower. During the recordkeeper transition from

66

Metropolitan Life to Empower in 2022, Ms. Williams-Linzey received a telephone call from Empower, wherein an Empower representative explained that Empower was now overseeing her employer's retirement plan. The advisor informed Ms. Williams-Linzey that she had a significant amount of money invested in her account and was not receiving matching employer contributions. This is when the Advisor recommended the Empower Self-Directed IRA as her best option.

172.    In communications surrounding the opening of a Self-Directed IRA in 2022, Empower advisor Gabriel Ward informed Ms. Williams-Linzey he would help her "better prepare for a successful retirement" and was committed to providing "personalized, unbiased advised that is given with your best interest and long-term retirement goals in mind." No advisor, including Mr. Ward, informed Ms. Williams-Linzey of any potential conflict of interest in recommending a Self-Directed IRA, or that Defendants might benefit financially by making that recommendation.

173.    During Ms. Williams-Linzey's conversations with Defendants' advisors, the advisors did not inform her of the fees associated with the Self-Directed IRA or how those fees compared in relation to other available options. The advisors failed to inform Ms. Williams-Linzey that the fees and expenses of moving assets to an Empower Self-Directed IRA were higher than those she would incur by remaining in her employer-sponsored retirement plan, and failed to

explain how paying higher fees would reduce the value of her retirement assets over time.

174.  Defendants' advisors also failed to disclose data to Ms. Williams-Linzey showing the projected performance of Empower Self-Directed IRA compared to the projected performance of her retirement assets if she remained in her employer-sponsored retirement plan. These conversations between Ms. Williams-Linzey and Empower advisors occurred within this District, in Somerset, New Jersey.

## CLASS ACTION ALLEGATIONS

175.  Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants of defined contribution plans subject to ERISA whose recordkeeper was an Empower entity and who initiated a rollover of assets from the participant's individual plan account to Empower's Non-Plan Products affiliated with Defendants at any time between January 1, 2015 and the date of judgment. Excluded from the class are participants of any plan sponsored by Defendants or their affiliates, and participants of plans subject to ERISA whose plan sponsors did not allow Defendants to cross-sell Non-Plan Products affiliated with Defendants.

176.  The proposed class meets the requirements of Rule 23(a) for the following reasons:

68

a.  The class includes thousands of members and is so large that joinder of all its members is impracticable.

b.  There are questions of law and fact common to the class including, without limitation: whether Defendants are fiduciaries with respect to the conduct that is the subject of this complaint; whether Defendants breached a fiduciary duty; whether Defendants caused a prohibited transaction; whether Defendants knowingly participated in ERISA violations by other fiduciaries; determining the proper remedies for Defendants' violations; and determining the amount of Defendants' unlawful profits.

c.  Plaintiffs' claims are typical of the claims of the class because each Plaintiff and all class members are pursuing the same legal theories arising from the same course of misconduct instituted on a company-wide basis.

d.  Plaintiffs are adequate class representatives because they have no interest that conflict with the members of the class, are committed to the vigorous representation of the class, and have engaged experienced and competent attorneys to represent the class.

177.  Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications that would establish

incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties and liability, and (B) adjudications by individual members would, as a practical matter, be dispositive of the interests of the members not parties to the adjudication or would substantially impair or impede those members' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

178.  A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all class members is impracticable, the losses suffered by individuals may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, the class may be certified under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

179.  Plaintiffs' counsel, Schlichter Bogard LLC, will fairly and adequately represent the interests of the class and is best able to represent the interests of the class under Rule 23(g). The firm has vast experience in the area of ERISA

fiduciary breach litigation and has been appointed class counsel in over 40 ERISA fiduciary breach actions.

180.    Dating back to 2006, the firm has a proven track record of vigorously pursuing the rights of ERISA plan participants. The firm was the first to try an ERISA excessive fee case and successfully obtain a judgment on behalf of plan participants. *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 45240 (W.D. Mo. Mar. 31, 2012). After multiple appeals to the Eighth Circuit and remands to the district court, and over 25,000 hours of attorney and paralegal time, the parties ultimately settled the action in 2019, almost 14 years after filing. *Tussey v. ABB, Inc.*, No. 06-4305, 2019 U.S. Dist. LEXIS 138880, at *4 (W.D. Mo. Aug. 16, 2019). *Tibble v. Edison International* is another example of the firm's unwavering efforts to protect the rights of ERISA plan participants. In particular, the firm appealed unfavorable rulings after a partial trial to the Ninth Circuit, lost there, and ultimately obtained a successful unanimous decision at the United States Supreme Court, reversing the Ninth Circuit. *Tibble v. Edison Int'l*, 575 U.S. 523 (2015).

181.    Indeed, the firm's efforts have "led to enormous fee savings for plan participants." *Cates v. Trs. of Columbia Univ.*, No. 16-06524, 2021 U.S. Dist. LEXIS 200890, at *15–16 (S.D.N.Y. Oct. 18, 2021) (noting that undersigned counsel's "fee litigation and the Department of Labor's fee disclosure regulations

approach $2.8 billion in annual savings for American workers and retirees")

(citation omitted). With these efforts, the firm is recognized "as a pioneer and the

leader in the field" of ERISA retirement plan litigation, *Abbott v. Lockheed Martin*

*Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015),

and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012

U.S. Dist. LEXIS 157428, at *10 (W.D. Mo. Nov. 2, 2012). The firm's work in

ERISA class actions has been featured in the New York Times, Wall Street

Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne

Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15,

2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29,

2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb.

23, 2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES

(Oct. 16, 2014); Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*,

WALL ST. J. (Aug. 25, 2015); Jess Bravin and Liz Moyer, *High Court Ruling Adds*

*Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); Jim Zarroli,

*Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014); Mark

Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*,

REUTERS (May 1, 2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison*

*Worker Appeal*, BLOOMBERG (Oct. 2, 2014).

**CAUSES OF ACTION**

**COUNT I: Breach of ERISA Fiduciary Duties**

182.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

183.    Based on the facts alleged above, Defendants acted as fiduciaries when providing investment advice to Plaintiffs and class members. 29 U.S.C. § 1002(21)(A)(ii). Defendants provided investment advice on a regular, ongoing basis. 29 C.F.R. § 2510.3-21(c)(1)(ii)(B). Defendants also acted as a fiduciary by exercising discretion and control over confidential participant data that was critical to plans' management and administration and using such data for its own marketing purposes. 29 U.S.C. § 1002(21)(A)(i), (iii).

184.    When acting as fiduciaries, Defendants were required to act "*solely* in the interest of the *participants* and beneficiaries and for the *exclusive* purpose of providing benefits to participants and their beneficiaries and defraying *reasonable* expenses of administering the plan[.]" 29 U.S.C. § 1104(a)(1)(A) (emphasis added). In other words, Defendants were obligated to act "with an eye single to the interests of the participants and beneficiaries." *Bierwirth*, 680 F.2d at 271; *Reich*, 57 F.3d at 291.

185.    Defendants were also required to act with "care, skill, prudence, and diligence" when formulating investment advice, 29 U.S.C. § 1104(a)(1)(B),

73

meaning the advice must reflect a thorough and impartial investigation of the participant's options.

186. The investment advice that Defendants rendered to Plaintiffs and class members was neither prudent nor loyal. Based on the facts described above, Defendants provided advice for the purpose of furthering their own financial interests. Thus, Defendants, improperly using the confidential information they obtained about participants, intentionally steered participants to Non-Plan Products because these were the more lucrative options for Empower, without regard for whether rolling assets to Non-Plan Products was in the participant's best interest or otherwise prudent.

187. Based on the facts described above, Defendants fraudulently concealed their breaches of fiduciary duty.

188. Based on the facts described above, Defendants violated 29 U.S.C. § 1104.

189. Based on the facts described above, Defendants each also knowingly participated in, concealed, and failed to remedy each other's breaches of fiduciary duty, resulting in co-fiduciary liability in addition to the grounds for their own liability. *See* 29 U.S.C. § 1105(a).

190. As a result of these breaches of fiduciary and co-fiduciary duties, Defendants are liable for all losses suffered by Plaintiffs and class members under

74

29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3). Further, all of Defendants'

profits made through the use of ERISA plan assets or realized as a result of their

breaches of fiduciary duty are subject to disgorgement or a constructive trust. *Id.*

## COUNT II: ERISA Prohibited Transactions

191.   Plaintiffs restate and incorporate the allegations contained in the

preceding paragraphs.

192.   Section 1106(b) prohibits self-dealing transactions between a plan and

a fiduciary. 29 U.S.C. § 1106(b). Based on the facts described above, Defendants

acted as fiduciaries when they rendered investment advice and recommendations

that Plaintiffs and class members roll assets from their ERISA plan accounts to

Empower's Non-Plan Products, which increased Defendants' compensation and

profits. In so doing, Defendants dealt with the assets of the plans in their own

interest or for their own account, in violation of 29 U.S.C. § 1106(b)(1); acted in a

transaction involving the plans on behalf of a party whose interests were adverse to

the interests of the plans, their participants and beneficiaries, in violation of 29

U.S.C. § 1106(b)(2); and received consideration for their own personal account

from parties dealing with the plans in connection with transactions involving the

assets of the plans, in violation of 29 U.S.C. § 1106(b)(3).

193.   Section 1106(a) prohibits transactions between a plan and a party in

interest. 29 U.S.C. § 1106(a)(1). Based on the facts described above, Defendants

75

are parties in interest because they were plan fiduciaries and entities providing services to the plans. 29 U.S.C. § 1002(14)(A) and (B). By rendering investment advice and recommendations that Plaintiffs and class members roll assets from their ERISA plan accounts to Empower's Non-Plan Products, thus increasing Defendants' compensation and profits, Defendants caused plans to engage in transactions which they knew or should have known constituted an exchange of property between the plans and a party in interest in violation of 29 U.S.C. § 1106(a)(1)(A); engage in transactions which they knew or should have known constituted the furnishing of services between the plans and a party in interest in violation of 29 U.S.C. § 1106(a)(1)(C); and engage in transactions which they knew or should have known constituted a transfer of plan assets to a party in interest in violation of 29 U.S.C. § 1106(a)(1)(D).

194.   Based on the facts described above, no statutory or regulatory exemption is available to relieve Defendants from liability for these prohibited transactions. Among other reasons, the investment advice that is the subject of this claim was not the result of an impartial recommendation or a prudent investigation of participants' options, and the transactions provided Defendants with unreasonable compensation.

195.   Based on the facts described above, Defendants fraudulently concealed these prohibited transactions.

196.   Based on the facts described above, Defendants each also knowingly participated in, concealed, and failed to remedy the prohibited transactions caused by the other, resulting in co-fiduciary liability in addition to the grounds for their own liability. *See* 29 U.S.C. § 1105(a).

197.   As a result of these prohibited transactions, Defendants are liable for all losses suffered by Plaintiffs, class members, and their respective plans under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3). Further, Defendants' profits made through the use of ERISA plan assets or realized as a result of these self-dealing and otherwise prohibited transactions are subject to disgorgement or a constructive trust. *Id.*

### COUNT III: Non-Fiduciary Recipient of Ill-Gotten Profits

198.   Plaintiffs restate and incorporate herein the allegations contained in the preceding paragraphs.

199.   Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. Fiduciary status is not a prerequisite to liability. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

200.   The Plan Sponsors of the plans in which the named Plaintiffs and proposed class members participate are named fiduciaries or functional fiduciaries

under ERISA. As such, the Plan Sponsors owed duties of loyalty and prudence to the plans and plan participants and were bound by ERISA's prohibited transactions provisions, which render *per se* unlawful certain transactions between their plans and party-in-interest service providers like Defendants.

201. Based on the facts described above, the Plan Sponsors breached their fiduciary duties by failing to protect Plaintiffs' and class members' interests and those of their plans by failing to monitor, account for, and/or ban Defendants' misuse of highly confidential data to benefit themselves by cross-selling Non-Plan Product services.

202. Had the Plan Sponsors discharged their ERISA obligations, Defendants would have been prevented from engaging in the conduct described herein.

203. In addition, based on the conduct described herein, the Plan Sponsors caused their plans to engage in non-exempt prohibited transactions which the sponsors knew or should have known constituted a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest or transfer to, or use by or for the benefit of a party in interest, of any assets of their plans.

204. Defendants knew that their own course of conduct described herein was unlawful. Defendants also knew that Plan Sponsors were not monitoring or restricting Defendants' cross-selling activities, knew of the circumstances that

78

rendered the Plan Sponsors' conduct a breach of fiduciary duties, and knew the circumstances that rendered the transactions involving their services and transfers and use of plan assets unlawful.

205.   As a result of their own misconduct and the Plan Sponsors' ERISA violations, Defendants knowingly received ERISA plan assets and improper profits derived from ERISA plan assets. Those assets and profits rightfully belong to Plaintiffs and class members.

206.   Thus, even if some Defendants were not ERISA fiduciaries, each Defendant remains subject to equitable remedies under 29 U.S.C. § 1132(a)(3), such as restitution, disgorgement, or constructive trust.

## JURY TRIAL DEMANDED

207.   Under Federal Rule of Civil Procedure 38 and the Constitution of the United States, Plaintiffs demand a trial by jury. In the alternative, Plaintiffs request an advisory jury on all issues not triable of right by a jury.

## PRAYER FOR RELIEF

Plaintiffs seek entry of judgment on each of their claims and request that the Court order the following relief:

- Find and declare that each Defendant breached its fiduciary duties and violated ERISA as described above or is otherwise liable for knowingly participating in its co-Defendant's misconduct;

79

- Find and declare that each Defendant is liable for knowingly participating in the Plan Sponsors' ERISA violations;

- Grant damages and appropriate equitable relief to remedy for each breach and violation, including recovery of damages or losses, disgorgement of ill-gotten profits, a constructive trust on ill-gotten profits, restitution, and surcharge against Defendants and in favor of Plaintiffs and the class so as to restore Plaintiffs and class members to the position they would have occupied but for Defendants' breaches and violations;

- Reversal of all prohibited transactions;

- Grant appropriate equitable relief, including without limitation disgorgement or a constructive trust on ill-gotten profits, restitution, and surcharge against Defendants and in favor of Plaintiffs and the class so as to restore Plaintiffs and class members to the position they would have occupied but for the Plan Sponsors' ERISA violations and Defendants' knowing participation in same;

- Order Defendants to provide all accountings necessary to determine the amounts of Defendants' profits, damages, and the amounts that must be restored to Plaintiffs and class members and their respective plans;

80

- Order Defendants to stop the practices described above and to notify, in a manner directed by this Court, each class member who transferred assets that this Court has so ordered;

- Certify the proposed class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter Bogard LLC as Class Counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of pre- and post- judgment interest to the extent it is allowed by law; and

- Grant other equitable relief as the Court deems appropriate.

March 31, 2026

Respectfully submitted,

s/ Chen Kasher
Chen Kasher, Bar No. 044882011
Jerome J. Schlichter (admitted *pro hac vice*)
Andrew D. Schlichter (admitted *pro hac vice*)
Joel D. Rohlf (admitted *pro hac vice*)
Patrick R. Kutz (admitted *pro hac vice*)
SCHLICHTER BOGARD LLC
100 South Fourth Street, Ste. 1200
St. Louis, MO 63102
Phone: (314) 621-6115/Fax: (314) 621-5934
ckasher@uselaws.com
jschlichter@uselaws.com
aschlichter@uselaws.com
jrohlf@uselaws.com
pkutz@uselaws.com

Ruben R. Chapa (admitted *pro hac vice*)
SCHLICHTER BOGARD LLC
33 North Dearborn, Ste. 1170
Chicago, IL 60602
Phone: (630) 919-9301
Fax: (314) 621-5934
rchapa@uselaws.com

Forrest James IV (admitted *pro hac vice*)
FOB JAMES LAW FIRM, LLC
2226 1st Ave South, Suite 105
Birmingham, Alabama 35233
Phone: (205) 407-6009
Fob@fobjameslaw.com

James Z. Foster (admitted *pro hac vice*)
FOSTER LAW LLC
1201 West Peachtree St, NW, Suite
2300 Atlanta, Georgia 30309
Phone: (404) 800-0050
Fax: (404) 493-2322
James@Foster-Law.com

*Counsel for Plaintiffs & the Proposed Class*

## CERTIFICATE OF SERVICE

I, Chen Kasher, hereby certify that on March 31, 2026, I caused the foregoing to be delivered electronically via email to all parties through their counsel of record.

s/ Chen Kasher
Chen Kasher
